KOENIGSBERG v. BLAU, City Marshal, et al.

(Supreme Court, Appellate Term. February 9, 1911.)

1. EXECUTION (§ 181*)—CLAIMS BY THIRD PERSON—OWNERSHIP OF PROPERTY SEIZED.

To assert title under a chattel mortgage to property seized under execution, the mortgagee must have been in possession of the chattels under a valid mortgage, so that plaintiff's mere possession of chattels, title to which he claimed under a chattel mortgage executed by H. and left in escrow, when they were seized under execution against H., did not give plaintiff title to the chattels, his possession being by virtue of a special agreement with H., by which plaintiff sought to remove the chattels to a place convenient for H.'s business, and apparently for his benefit.

[Ed. Note.—For other cases, see Execution, Dec. Dig. § 181.*]

2. CONTRACTS (§ 14*)—OPERATION—INTENT.

A contract is not binding unless the parties so intend.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 48; Dec. Dig. § 14.*]

3. ESCROWS (§ 8*)—OPERATION.

Where the one to whom a bill of sale, which was in the nature of a chattel mortgage, was delivered in escrow, had, as a creditor of the mortgagor, an interest in the security, the parties to the instrument of sale could not waive conditions therein upon the performance of which it was to be delivered so as to make it operative to give absolute title to the mortgagee, without the consent of the depositary.

[Ed. Note.—For other cases, see Escrows, Cent. Dig. §§ 9, 10; Dec. Dig. § 8.*]

4. TRIAL (§ 266*)—INSTRUCTIONS—REQUESTS—MODE OF GIVING.

Where a requested charge was proper when applied to the facts, the giving of it as being correct "technically," the effect of which was to aggravate the error in a former charge, it was error to refuse other proper charges which would have rendered the requested charge given applicable to the facts.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 663–667; Dec. Dig. § 266.*]

Appeal from City Court of New York, Trial Term.

Action by Louis Koenigsberg against Adolph L. Blau, one of the Marshals of the City of New York, and another. From a judgment for plaintiff, and an order denying a motion for a new trial, defendants appeal. Reversed, and new trial granted.

Argued before HENDRICK, LEHMAN, and DELANY, JJ.

Henry C. Burnstine (Wales F. Severance, of counsel), for appellants.

Isidore Lowenbraun (Moses Feltenstein, of counsel), for respondent.

LEHMAN, J. The plaintiff has recovered a judgment for the conversion of property which he claims belonged to him. The defendant Blau, a city marshal, seized and sold this property under an execution issued under a judgment of the Municipal Court in favor of the de-

fendant Burnstine against the firm of Brust & Hartenstein. If the seizure was unlawful, there is no question but that both Blau, who made the seizure, and Burnstine, who directed it, are liable. The case has been tried twice. At the first trial the trial justice excluded testimony which this court considered material. See Koenigsberg v. Blau, 119 N. Y. Supp. 708. Upon the second trial this testimony was admitted. The evidence introduced at this trial shows that at the time the goods were seized the property was claimed by the plaintiff as his own. The goods were placed in a loft at 200 Middleton street, which was not the regular place of business of Brust & Hartenstein. The plaintiff apparently leased these premises, and paid the rent in his name, and not Brust & Hartenstein. To meet this prima facie case, the defendants established partly by independent testimony and partly by defendants' cross-examination that prior to April 5th the firm of Brust & Hartenstein were indebted to the defendant Burnstine in the sum of $450, that about that time Burnstine became restive over the firm's failure to pay his debt, and that he then learned that the firm had given a chattel mortgage on their tools and machines to the plaintiff Koenigsberg, who was in their employ. Burnstine objected to this mortgage, apparently claiming that it was either fraudulent or constituted an unlawful preference. Brust & Hartenstein, the plaintiff, and the plaintiff's attorney thereupon met Burnstine at the office of his attorney, who is also his nephew. The plaintiff there surrendered his chattel mortgage and a note which it secured, and the parties joined in the execution of three instruments introduced in evidence as "Defendants' Exhibits A, B, and C." These instruments are:

(A) A bill of sale from Brust & Hartenstein, as party of the first part, to the plaintiff, Koenigsberg, as party of the second part, covering the tools of the firm, which are in the main admittedly the goods seized by the marshal. This bill of sale is made "upon condition, however, that if we, the said parties of the first part, shall and do well and truly pay unto the said party of the second part, his executors, administrators and assigns the true and lawful sum of $450 on or before the 8th day of August, 1907, then these presents shall be void. And upon further condition that the aforementioned goods and chattels shall be and remain in the custody, possession and control of the said parties of the first part, to be used by them during the said period from the date of these presents to the 8th day of August, 1907, as provided in and by a certain agreement between the parties hereto, of even date herewith."

(B) The agreement between the same parties referred to in the bill of sale. This agreement provides that, whereas the party of the second part is desirous for the purpose of securing himself for an indebtedness due him of $400 of securing a bill of sale, the parties of first part agree to execute simultaneously therewith a bill of sale of all their machinery and tools, "with certain exceptions, and to deliver the same to Nathan Burnstine conditioned upon the performance by the party of the second part of the covenants and agreements hereinafter made by him." These covenants and conditions so far as material to this action are that the bill of sale shall be defeasible upon

payment of $450 from the date thereof, and other provisions as follows:

"It is further understood and agreed that such bill of sale shall also contain a provision giving to the parties of the first part full and complete custody and control of all of the chattels therein specified, together with the right to use the same throughout said period of four months, it being understood, however, that the party of the second part, after the performance by him for the parties of the first part of the work hereinafter set forth, shall have the right to use such chattels, which right however, shall be inferior to that of the parties of the first part, and at such time as the same are not being necessarily used by said last mentioned parties in their business, or the business of either of them.

"The party of the second part further agrees to remove at his own proper cost and expense, pursuant to the authorization by the parties of the first part hereby given, all of the aforesaid chattels together with the materials now in the premises No. 96 Throop avenue, New York City, Brooklyn borough, to a loft convenient for the business of the parties of the first part, which loft shall be located in New York City, either in the borough of Brooklyn or the borough of Manhattan, the rent for which shall be paid by the party of the second part, it being understood, however, that the parties of the first part shall pay one-half of the first month's rent of such loft, but shall thereafter pay one-half of such rent each month only in the event that they do work therein.

"And it being further understood that, if they do not pay such one-half rent, the party of the second part shall alone have the right to use such chattels for the purpose of doing his own work during that particular month.

"The party of the second part hereby agrees to work in the capacity of employé in their general sheet metal and roofing business, for the parties of the first part, as he has heretofore worked for them, for such time as it shall be necessary for the said parties of the first part to work to complete the work by them to be performed, under certain contracts now existing between them, and one Polstein, one Rosenberg & Pearlson, and one Reis, upon buildings situated respectively on Amsterdam Avenue, between 114th and 115th streets, New York City, Manhattan Borough, 146th street, between Seventh and Eighth avenue, in the borough of Manhattan city of New York, and Chelsea street, New York City, Brooklyn borough, it being understood, however, that said party of the second part shall not be obliged to work for any period longer than six weeks from April 8th, 1907, and it being further understood and agreed that the said party of the second part shall receive no remuneration whatsoever for such work, except as hereinabove set forth, and that such work shall be performed by him for five and one-half days in each and every week during said necessary period, and eight hours during each day thereof.

"It is understood and agreed that the bill of sale aforesaid shall be held by the said Nathan Burnstine to be delivered to the said party of the second part only upon the full performance hereunder by the party of the second part of his covenant to work for the parties of the first part until the completion of the contracts aforesaid."

(C) A certificate of Nathan Burnstine that he holds the bill of sale in escrow "conditioned upon the full performance by him prior to such delivery of his covenant to perform certain work for the said Brust & Hartenstein as set forth in a certain agreement made between said parties bearing even date herewith," and containing the following provision:

"It is further understood that the said Nathan Burnstine hereby agrees to deliver the said bill of sale to the said Koenigsberg only upon receipt by him of a notice in writing, signed by the said firm of Brust & Hartenstein, or either member thereof, if such member has succeeded to the rights of the said firm, which notice shall state that the said Koenigsberg has complied

with the aforesaid covenant in said agreement, and shall authorize the said Burnstine to deliver said bill of sale to him."

This certificate bears the indorsement of Brust, Hartenstein, and Koenigsberg that they agree to the terms and conditions upon which the bill of sale is held in escrow. On cross-examination the plaintiff admitted that during May he was working at least part of the time for Brust & Hartenstein, that "they had their place in my shop," and that he was an employé of Brust & Hartenstein at the time of the levy. He also admitted that he claimed no title to the property except under the bill of sale.

It further appears that the so-called bill of sale was never delivered to the plaintiff, but was retained by the defendant Burnstine, and that the plaintiff never delivered to Burnstine the letter from Brust & Hartenstein stating that plaintiff has complied with the conditions. It does appear, however, that the six weeks have elapsed before the levy; that plaintiff has performed all the work required of him by Brust & Hartenstein; that one of the three contracts known as the Polstein contract was assigned by that firm to Burnstine; and that the firm told plaintiff that they could not finish that job, as Burnstine refused to allow them to work on it.

The only real conflict of evidence in the case is upon the points whether or not the firm ever gave the plaintiff a letter that he had complied with the conditions of the agreement, and whether or not at the time the instruments were executed it was agreed that the firm should assign to the defendant all three contracts which were to be completed by the plaintiff. The defendant claims that they failed to carry out this agreement, and that thereupon he sued the firm, obtained judgment against them, and levied upon their interest in the property covered by the bill of sale.

Upon the last appeal this court carefully considered the effect of this evidence, and decided that:

"The question presented is this: Was the title to these chattels at the time of the seizure in plaintiff or in Brust & Hartenstein, the judgment debtors, against whom the execution, under which the chattels were taken, was issued? The plaintiff stated on the stand that it was in virtue of the bill of sale so left in escrow, as above stated, that he claimed title to the chattels. The plaintiff, it will be remembered, obtained possession of the chattels, not by virtue of the bill of sale, but by a special agreement, above set forth, by which plaintiff was to remove the chattels to a loft in New York convenient for the firm's business, apparently for the benefit of the said firm, and by their special authorization, so that the mere possession of the chattels at the time of the seizure can hardly be regarded as evidence of title." Koenigsberg v. Blau, supra.

I concurred in that opinion at the time it was rendered after careful consideration and discussion, and, after reconsidering it in the light of all the testimony presented in this voluminous record, I am still convinced of the correctness of the rule laid down. The evidence now presented shows that the so-called bill of sale is a chattel mortgage. The plaintiff to show title in himself must show that there is a valid mortgage in existence, and that he is in possession of the goods covered by that mortgage and under the terms of that mortgage. The possession taken by virtue of the special agreement was a mere right

to use the chattels, and the agreement specifically provided that he held them subject to the full custody and control of the mortgagors. He has no title unless the mortgage has had a valid inception and the plaintiff was in possession under that instrument. The defendant claims that delivery of the instrument was a necessary element of the plaintiff's title, and seeks to distinguish this case from the line of cases holding that title to land does not pass until the actual delivery of a deed which has been held in escrow. Conceding, without deciding, that there is a valid distinction between the cases on the ground that the delivery of a deed is the modern substitute for a livery of seisin, yet there is no doubt that no contract or instrument has a valid inception without the intent to make it binding and operative. "The learned counsel both in their original and supplemental briefs put great stress upon the proposition that a binding contract may be made without a physical delivery of the instrument evidencing the contract. * * * The cases holding this doctrine are exceptional, and require evidence, and very satisfactory evidence, that the parties intended that the contract should be binding and operative. The general rule is the other way." Dietz v. Farish, 79 N. Y. 520, at page 525.

In this case the parties have expressly agreed that the instrument should not be delivered except upon the completion of certain work. The instrument certainly was not at that time intended to have any inception. The instrument was placed in Burnstine's hands apparently for the purpose of protecting his interests, and the parties contemplated that the title to the goods was to remain unchanged until Burnstine delivered the instrument. Since the conditions were imposed at least partly for Burnstine's advantage, Brust & Hartenstein could not waive such conditions, and make the instrument operative without Burnstine's consent. By the agreements between the parties, Brust & Hartenstein were held out as owners until the plaintiff delivered a letter from them that the conditions were fulfilled. In the most favorable view of the testimony the plaintiff is entitled to succeed only as he has shown that the defendant by his wrongful acts waived the failure of plaintiff to work on the Polstein contract, and, even without the delivery of the letter, was bound to know that the other conditions were all complied with by the mortgagee or waived by the mortgagor. Even if we should concede that there is testimony to support such a finding, the question was one of fact for the jury. The trial justice, however, charged the jury squarely that the only question for them to consider is whether under those instruments the plaintiff went into immediate possession and continued in possession of the property in question or whether Brust & Hartenstein were in possession.

A proper exception was taken to this charge, and the defendant requested the justice to charge various propositions of law to bring before the jury his contention already approved by this court that the possession taken under the agreement of April 5th was insufficient to establish title. These requests were perhaps too broad, and were properly refused. The defendants then requested the justice to charge that:

"It is not sufficient for the plaintiff to succeed that he should show, and that he cannot recover merely by showing, he was entitled to possession of the property taken by the marshal on May 25, 1907, or was in possession thereof."

The court answered:

"I so charge. You must take in consideration my former charge, but this, I charge, is right technically."

Here was no request to charge an abstract proposition of law, but a correct statement of the law applied specifically to this case. It was not only technically correct, but, if charged unreservedly, would have tended to cure the error in the justice's original charge. In the form charged it merely emphasized that error. Thereafter the defendants presented numerous requests to charge, and, in view of the meagerness of the original charge, each of these requests deserved consideration.

The rulings of the trial justice on these requests served only further to confuse the issues. In some instances he refused to charge except as charged when the charge failed to touch on the point. In one instance he charged, undoubtedly through inadvertence, that there was no claim that the plaintiff was in possession of the goods, and in another instance he charged that there could be no recovery without proof of the actual delivery of the mortgage, although there is no dispute that the mortgage was never delivered.

The respondent seeks to sustain the verdict in spite of these errors by the claim that these errors were inadvertent, and that the trial justice did not mean to say what the record shows that he said. I have not the slightest doubt but that the record either fails to correctly show what the justice actually said or that in the necessary haste of considering requests he either misunderstood the requests, or forgot the shortness of the original charge. The sole question before us, however, is whether the record shows a proper presentation of the questions to the jury, and this question, I believe, must be answered in the negative.

Judgment should be reversed and a new trial granted, with costs to appellant to abide the event. All concur.